UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.

TAIRE CHANEY,
                 Defendant.
_____

**REPORT AND RECOMMENDATION**

15-CR-00134-WMS-JJM

        Defendant is charged in a three-count Indictment [1][1] with conspiring to possess with intent to distribute, and to distribute, cocaine, in violation of 21 U.S.C. §846, with discharging a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§924(c)(1)(A)(iii) and 2, and with discharging a firearm causing the death of Brad Daniels in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§924(c)(1)(A)(iii), 924(j)(1), and 2. Before the court is defendant's motion to suppress statements which he made to law enforcement in May 2013. [118], §III; [127].[2] An evidentiary hearing was held on April 24, 2019 [162], at which FBI Special Agent ("SA") Mark Schirching and Assistant United States Attorney ("AUSA") Timothy Lynch testified. Thereafter, the parties filed post-hearing submissions [170-173], and oral argument was held on August 14, 2019 [174]. For the following reasons, I recommend that the motion be denied.

---

[1]    Bracketed references are to CM/ECF docket entries. Unless otherwise indicated, page references are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

[2]    Defendant's counsel agreed at oral argument that the remaining portions of defendant's pretrial motion had been resolved by Magistrate Judge Hugh B. Scott. *See* September 28, 2018 Decision and Order [136].

## BACKGROUND

On April 19, 2013, AUSA Lynch applied for and was granted a writ of habeas corpus ad testificandum, directing that defendant be produced from the Five Points Correctional Facility (where he was serving a 25-year state sentence) to testify on May 1, 2013 before a grand jury in the Western District of New York on May 1, 2013. Hearing transcript [162], pp. 70-71; gov. ex. 9 [161-9]; Chaney Affidavit [127], ¶4. The grand jury was scheduled that day to hear testimony against Tyshawn Bradley ([162], pp. 71-73; gov ex. 13 [161-13]), who was the alleged head of a large-scale drug trafficking organization that had been indicted on March 27, 2013, along with eleven co-defendants. [162], p. 8; gov ex. 11 [161-11]. Although defendant had been a close associate of Mr. Bradley, when the investigation into Mr. Bradley commenced in summer 2012, he was incarcerated on the charges that led to the 25-year sentence of incarceration he was serving. Id., pp. 9-11.

Since defendant had been involved in the narcotics trafficking portion of Mr. Bradley's operation, the FBI wanted to talk to him in connection with its continuing investigation into additional gun, money laundering, and drug crimes committed by Mr. Bradley. Id., pp. 16-17. Law enforcement hoped that defendant would be a cooperative witness who could testify before the grand jury. Id., p. 47. However, defendant was not being actively investigated, was not a target of the investigation, and no federal case had been opened against him. Id., pp. 15, 17, 79. The FBI had not earlier interviewed defendant because it did not want Mr. Bradley to learn of the investigation prior to the return Indictment against him. Id., p. 16.

As of May 1, 2013, AUSA Lynch and SA Schirching had not previously spoken

to defendant and did not know what, if anything, he would say, or whether he would be truthful. [162], pp. 8, 20, 46, 74. Because of that, AUSA Lynch intended to interview defendant before his scheduled grand jury testimony, a practice which AUSA Lynch employed with grand jury witnesses. Id., pp. 74-75.

Defendant was driven by two City of Buffalo Police Officers from Wende Correctional Facility to the United States Attorney's Office at approximately 10:00 a.m. Id., pp. 46, 48.[3] Although his handcuffs were removed, he remained shackled. Id., p. 21. Six armed law enforcement officers from the FBI and City of Buffalo Police were present for the interview, which was not recorded. Id., pp. 58, 61. Defendant was told that they wanted to talk to him about his knowledge of Mr. Bradley, and that Mr. Bradley had been arrested. Id., p. 67. At the outset of the interview, SA Schirching read defendant his Miranda warnings from a FD-395 Advice of Rights form. Id., p. 22; gov. ex. 1 [161-1]. Defendant acknowledged that he understood his rights, indicated that he was willing to talk, and signed the Advice of Rights waiver at 10:08 a.m. [162], pp. 22-23; gov ex. 1 [161-1]. Although defendant was not a target of the investigation, SA Schirching had him complete the Miranda waiver "in an abundance of caution", because he was in state custody. [162], p. 22. AUSA Lynch was not present when defendant was Mirandized, but was present for portions of the interview. Id., pp. 24, 75.

During the May 1, 2013 interview, defendant provided "a lot of information", some of which law enforcement wanted to vet. Id., p. 24. Because of that, and the fact that the interview continued for several hours, defendant agreed to continue the interview. Id., pp. 24-25, 60.

---

[3]     Defendant had been transferred from Five Points Correctional Facility to Wende Correctional Facility. [162], pp. 45-46.

-3-

The interview resumed on May 8, 2013, the next grand jury date. Id., pp. 27, 63. A second writ was used to secure defendant's appearance, and he remained shackled, but was not handcuffed because he was "being very cooperative and . . . it was a very respectful discussion". [162], p. 25; gov. ex. 10 [161-10]. Defendant also completed another FD-395 Advice of Rights form before the interview commenced. Id., pp. 26-27; gov. ex. 2 [161-2]. According to SA Schirching, law enforcement continued to intend to utilize defendant "as a witness, and there was . . . the hope that eventually he would testify before the grand jury once all of the information that we needed to get from him was vetted and verified.". [162], pp. 27-28.

The May 1 and 8, 2013 interviews were conducted in a friendly and respectful manner, and were memorialized in FD-302s prepared by SA Schirching. Id., pp. 31-32; gov. exs. 5 and 6 [161-5, 161-6]. At no point during either interview did defendant ask to cease the interview or request an attorney. [162], pp. 65-66. Nothing was offered to defendant for his cooperation. Id., p. 67. During these interviews, defendant "provided a surprising level of detail" and "some of the most articulate information [SA Schirching] had ever gotten from a person in an interview". [162], pp. 31-32. Law enforcement was able to corroborate much of the information he provided. Id., pp. 32, 42-43.

Defendant admitted to murders and discussed Mr. Bradley's involvement in some of them, including the murder of Brad Daniels in which they were both shooters, and identified a firearm linked to Mr. Bradley. Id., pp. 33-34, 39-41. In fact, during the interview defendant was shown a document prepared by the Erie County Crime Analysis Center titled "The Guns of Chaney", which detailed various murders and shootings that had been ballistically linked to him, and he "almost had a certain pride about . . . what was on there". Id., p. 35; gov ex. 7 [161-7].

However, he adamantly denied having any involvement in the murder of Brandon Hall. [162], p. 28.  SA Schirching explained that because law enforcement had information that defendant was involved in that murder, "we were concerned that . . . we could not move forward with him as a witness without attempting to vet that out a little bit more. So we had spoke to [defendant] about him undergoing a polygraph, which he said he was willing to do." Id.   He further explained that this was important to the investigation because "we didn't want to use a witness who was hiding something or being untruthful and put ourselves in a position to put a witness on the stand to testify and build a case around him". Id., p. 29.

       Defendant was brought back to the FBI headquarters on May 15, 2013 and completed two FD-395 Advice of Rights forms, one for SA Schirching and one for the polygraph examiner, Malynda Irby.  Id., pp. 29-31, 56; gov. exs. 3, 4 [161-3, 161-4].  Because defendant failed the polygraph concerning the Hall murder, he did not become a cooperator.  Id., p. 43.  However, even without his testimony, a Superseding Indictment was returned against Mr. Bradley and his co-defendants on June 11, 2014.  Gov. ex. 12 [161-12].  Defendant was indicted on July 10, 2015 [1].

       Although defendant did not testify at the suppression hearing, he submitted an Affidavit [127] stating that on May 1, 2013 he advised law enforcement that he wanted a lawyer and was told that one would be provided to him. Id., ¶¶4, 7, 13. He also states that he was told that he was not free to return to his cell, that he was in a "coercive environment", and denies that he made the statements that were attributed to him in SA Schirching's FD-302 reports.  Id., ¶¶12, 13.

**DISCUSSION**

Defendant argues that defendant's Miranda waivers were not knowing or voluntary. Defendant's Post-Hearing Brief [171], pp. 9-24. In support of that argument, he contends that the alleged pretextual use of the writs was an abuse of process (id., pp. 10-19), that the circumstances of the interview were coercive (id., pp. 19-24), and that there was no actual testimony that he acknowledged or waived his Miranda rights in the second and third interviews (id., p. 24).[4]

The government "must prove by a preponderance of the evidence that the defendant relinquished his rights voluntarily with a full awareness of the rights being waived and the consequences of doing so". United States v. Gaines, 295 F.3d 293, 297 (2d Cir. 2002). "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (*quoting* Moran v. Burbine, 475 U.S. 412, 421 (1986)). The voluntariness of a defendant's Miranda waiver and

---

[4] Defendant also argues that since "there was no application for a writ or order to keep [him] in the Buffalo area for the purpose of the polygraph interview", the polygraph report should be suppressed. Defendant's Post-Hearing Brief [171], p. 25. In response, the government acknowledges "polygraph examinations are not admissible at trial", explaining that its "only significance" was as "further evidence of the defendant's voluntary waiver and further evidence as to why the government did not ultimately utilize the defendant as a witness in the Grand Jury". Government's Reply [173], p. 7. Based on that representation, I recommend that this portion of the motion be denied as moot. *See* United States v. Butler, 2017 WL 4324684, *2 (W.D.N.Y. 2017) ("when the government represents that it will not use certain evidence against a defendant, a motion to suppress that evidence is moot").

subsequent statements must be determined from the totality of the circumstances. *See* United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012).

In determining whether defendant knowingly, intelligently, and voluntarily waived his Miranda rights, "this case turns, as many do, on the issue of credibility". United States v. Bayless, 921 F.Supp. 211, 213 (S.D.N.Y. 1996). "It is within the province of the district court as the trier of fact to decide whose testimony should be credited." Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012).

Since I did not have the opportunity to evaluate defendant's credibility through live testimony, where the parties' versions of events diverge, I give considerably less weight to his Affidavit than I do to the live testimony of SA Schirching and AUSA Lynch, both of whom I find to be credible. *See* United States v. Murray, 2015 WL 7871358, *4 (W.D.N.Y. 2015) ("courts give greater weight to witness testimony, which was subject to cross examination, than to sworn affidavits"); United States v. Faux, 828 F.3d 130, 2016 WL 3648331, *1, n. 1 (2d Cir. 2016) ("Faux elected not to testify at the evidentiary hearing. It appears likely, however, that the district court was not able to credit her version of the events when it conflicted with the Government's version. Faux's account was presented in an affidavit and was not subject to cross examination; the Government's evidence included live testimony from the two agents who conducted the interview and were subject to cross examination"). *See also* California v. Green, 399 U.S. 149, 158 (1970) (cross-examination is "the 'greatest legal engine ever invented for the discovery of truth'").

**A.      Was the Use of the Writs an Abuse of Process Warranting Suppression?**

"Although typically an individual's presence before a grand jury is secured by the issuance of a grand jury subpoena, when a prisoner's appearance before a grand jury is sought, issuance of a writ of *habeas corpus ad testificandum* is an appropriate means by which his appearance may be secured." United States v. Lach, 874 F.2d 1543, 1548 (11th Cir. 1989). Crediting the testimony of SA Schirching and AUSA Lynch that they sought to use defendant as a grand jury witness in the prosecution of Mr. Bradley ([162], pp. 29 and 69), I find no merit to defendant's argument that the writs used to secure his attendance for the May 1 and 8, 2013 interviews were an abuse of process and resulted in his false imprisonment.[5]

Nor was there anything improper about interviewing defendant and vetting his information before placing him before the grand jury. "[T]he United States Attorney is allowed considerable leeway in attempting to prepare for a grand jury investigation and must regularly interview witnesses prior to appearances before the grand jury". United States v. Merrill, 685 F.3d 1002, 1013 (11th Cir. 2012).

As evidence that defendant was not brought in with the intent of being a grand jury witness, defendant points to the fact that "for all intents and purposes" he and Mr. Bradley participated in and were charged with the same conspiracy (defendant's Post-Hearing Brief [171], p. 15). He also relies on the Polygraph Examination Report [171-1], which stated that "Operation Poison Fruit" was initiated in 2012 by the FBI and identified defendant as a member of the Dodgetown Gang. Defendant's Post-Hearing Brief [171], p. 7. Neither of these facts raise

---

[5]      Based on this conclusion, it is unnecessary for me to resolve the parties' dispute as to whether suppression is the appropriate remedy for the improper use the Writs. *See* defendant's Post-Hearing Response [172], pp. 8-9; government's Reply [173], p. 7.

doubt as to the veracity of SA Schirching's and AUSA Lynch's testimony that defendant was not a target of law enforcement's investigation. As the government notes, it "regularly uses individuals as witnesses who are co-conspirators". Government's Reply [173], p. 3.

Defendant also points to the fact that he was never brought before the grand jury as evidencing the government's actual intent. Government's Post-Hearing Brief [171], p. 8. However, as SA Schirching explained, defendant was no longer considered a viable grand jury witness when law enforcement concluded that he was not being truthful about the Hall murder. [162], p. 43. I find nothing incredible about the government initially seeking to use defendant as a grand jury witness concerning Mr. Bradley's conduct, but electing not to when it was learned that he was not fully credible.

**B.** **Were the Circumstances of the Interviews Sufficiently Coercive to Render Defendant's Miranda Waivers Involuntary?**

Crediting the testimony of SA Schirching and AUSA Lynch, I conclude that defendant's four written Miranda waivers over the course of three different days were knowingly and voluntarily obtained. While it is undisputed that defendant was transported from state incarceration to a room in the United States Attorney's office with six armed law enforcement officers and an Assistant United States Attorney, standing alone, these coercive aspects are not sufficient, when viewed in the totality of the circumstances, to demonstrate that defendant's Miranda waiver and subsequent statements were involuntary.

First, defendant "was read his Miranda rights and signed a written waiver". United States v. Guzman, 879 F. Supp. 2d 312, 316 (E.D.N.Y. 2012). Second, defendant was an inmate with a lengthy record (*see* government's Reply [173], p. 6) incarcerated for a murder and

-9-

likely familiar with his Miranda rights, police questioning, and being shackled. *See* United States v. Ruggles, 70 F.3d 262, 265 (2d. Cir.1995) ("there is nothing in the record to indicate that [the defendant] lacks maturity, education or intelligence . . . . He was familiar with his Miranda rights, including the right to remain silent"). Though the law enforcement officers present were armed, there is no claim that they brandished their weapons. *See* United States v. Drayton, 536 U.S. 194, 205 (2002) ("[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon"). Finally, the undisputed facts establish that the interviews were conducted in a respectful manner and defendant points to no threats or unfulfillable promises that overbore his will or to any mental or physical defects that made him more susceptible to coercion.

As evidence that defendant's will was not overborne, he repeatedly denied his participation in the Hall murder, even after failing the polygraph examination. *See* United States v. Newton, 2012 WL 170008, *5 (D.Vt. 2012) ("in the face of the agents' questioning, Defendant maintained the firearm was intended only for home protection and not for use in a drug distribution business or for intimidation, thus evidencing his retention of his free will"); United States v. Artis, 2010 WL 3767723, *9 (D.Vt. 2010) ("there is clear evidence that Mr. Artis's will was not in fact overborne. When he was repeatedly confronted with law enforcement's disbelief regarding his account of how he obtained the firearm, he refused to change his story even when told that untruthful statements could be charged as a crime").

Defendant argues that it is illogical that "without any apparent promise of immunity or leniency, [he] went into a lengthy and voluntary discussion of his drug-dealing activity with Tyshawn Bradley, including his alleged role in the shooting of Brad Daniels with

-10-

Bradley". Defendant's Post-Hearing Brief [171], p. 6. However, defendant made no allegation in his Affidavit that he agreed to cooperate because of promises of immunity or leniency, much less that unfulfilled promises of immunity or leniency were made to him. Even though it may be difficult to discern an alternative motivation for defendant's cooperation, "[p]eople confess for many, many reasons: guilt, braggadocio, feelings of moral certainty, shame, and perhaps even for the notoriety of the act." United States v. Gordon, 638 F. Supp. 1120, 1143 (W.D. La. 1986), aff'd, 812 F.2d 965 (5th Cir. 1987). *See also* United States v. Collins, 2016 WL 1639960, *6 (N.D. Ga.), adopted, 2016 WL 1623910 (N.D. Ga. 2016) ("defendants frequently cooperate in situations that, in 20/20 hindsight, seem unwise or fantastical"); United States v. Robers, 2009 WL 700188, *9 (E.D.N.Y. 2009), aff'd, 660 F.3d 149 (2d Cir. 2011) (the defendant "may have cooperated for . . . many other reasons that have nothing to do with coercion").

In any event, "the issue is not [defendant's] subjective motivation . . . but whether the police did or said anything that coerced him". Collins, 2016 WL 1639960 at *6. Whatever his underlying motivation(s) for cooperating may have been, there is no credible evidence before me that his Miranda waivers and subsequent statements were not voluntary.

While defendant states that he informed the officers that he wanted a lawyer and was told that one would be provided to him (defendant's Affidavit [127], ¶7), those claims are difficult to reconcile with his signing several subsequent waivers of his Miranda rights, and with the fact that he continued the interviews without the promised attorney, despite being advised on at least four occasions of his right to not answer questions without a lawyer present.

Defendant further argues that "he was misled about the premise of the interview". Defendant's Response [172], p. 2. However, no such allegation is raised in his Affidavit. In any

-11-

event, I credit the testimony of SA Schirching and AUSA Lynch that defendant was not a target of the investigation, and even though defendant was told that they wanted to talk to him about Mr. Bradley's criminal activities, that representation did not render his Miranda waiver or subsequent statements involuntary. See United States v. Tapp, 812 F.2d 177, 179 (5th Cir. 1987) ("[d]efendant Tapp makes no claim that he was told that he would never become a target of the investigation. The record shows only that in January 1985 agent French stated that Tapp was not then a target of the investigation. There is nothing in the record to indicate that this was not a truthful representation when made. Further, whereas the first interview did not entail matters directly involving Tapp's activities, the last two did. Following immediately upon the waiver of Miranda rights, this should have alerted Tapp").

### C.  Is there Sufficient Evidence that Defendant Explicitly Acknowledged and Waived his Miranda Rights in the Second and Third Interviews?

Defendant argues that "other than the FD-395 forms . . . there was no testimony that he understood or waived his rights for the second interview or polygraph examination". Defendant's Post-Hearing Brief [171], p. 24.  In response, the government argues that defendant's knowing and voluntary waiver can be inferred from his actions and statements, and that he has provided nothing to support these claims. Government's Reply [173], pp. 5-6.  I agree.

"The best evidence that [defendant] received Miranda warnings are the multiple signed statements affirming that he was advised of his constitutional rights, that he understood those rights, and that he wished to forego his rights and answer the detectives' questions." United States v. John Eastman, 2016 WL 4357492, *11 (D. Conn. 2016), aff'd, 764 Fed. App'x 58 (2d

Cir. 2019) (Summary Order).  Notably, defendant does not deny that he read his Miranda rights on each occasion, that he understood those rights, or that he waived them.  Without that, there is no basis for me to question defendant's written acknowledgment in each of the Advice of Rights forms that he understood his rights and was willing to answer questions without a lawyer present. Gov. exs. 2-4 [161-2 – 161-4].

## CONCLUSION

For these reasons, I recommend that defendant's motion to suppress ([118], §III) be denied.  Unless otherwise ordered by District Judge William M. Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by September 3, 2019. Any requests for extension of this deadline must be made to Judge Skretny.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the

objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: August 20, 2019

>/s/ Jeremiah J. McCarthy
>JEREMIAH J. MCCARTHY
>United States Magistrate Judge